

**SIGNED this 20 day of March, 2012.**

_James P. Smith_

**James P. Smith**
**United States Bankruptcy Judge**


UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ATHENS DIVISION


| | | |
|---|---|---|
| In the Matter of: | : | Chapter 13 |
| | : | |
| | : | |
| F. NEAL PYLANT, JR., | : | |
| | : | |
| Debtor | : | Case No. 11-30671 JPS |
| | : | |
| NORMA JEANNE PYLANT, | : | |
| | : | |
| Plaintiff | : | |
| | : | |
| vs. | : | |
| | : | |
| F. NEAL PYLANT, JR., | : | Adversary Proceeding |
| | : | No. 11-3056 |
| Defendant | : | |


BEFORE

James P. Smith
United States Bankruptcy Judge

APPEARANCE:

Counsel for Plaintiff:                        James C. Warnes
Timmons, Warnes & Associates, LLP
244 East Washington Street
Athens, Georgia 30601

Counsel for Defendant/Debtor:        Ernest V. Harris
Harris & Liken, LLP
P.O. Box 1586
Athens, Georgia 30603

## AMENDED MEMORANDUM OPINION *

This case presents the issue of whether Debtor's obligation under a divorce

settlement agreement to provide his former wife with a house in which to live is

dischargeable under 11 U.S.C. § 523(a)(5) and § 1328(a)(2). After a trial held on

January 24, 2012, the Court publishes these findings of fact and conclusions of law pursuant

to Fed. R. Bank. P. 7052 and Fed. R. Civ. P. 52(a)(1).


## FACTS

Neal ("Debtor") and Norma ("Norma") Pylant were married December 10, 1983.

During the course of their marriage, the couple had one son and three daughters.

The couple separated sometime in 2007 and filed for divorce in the Superior Court of

Oconee County, Georgia (the "State Court"). Both parties were represented by experienced

counsel throughout the divorce proceedings. After the entry of two temporary orders by the

State Court, and after three lengthy mediation sessions, followed by additional negotiation,

the couple entered into a Settlement Agreement[1] in January, 2009, pursuant to which the

parties settled all issues relating to the divorce, including property division, child support

and alimony. A Final Judgment and Decree of Divorce (the "Divorce Decree"), which

---

[1] The two temporary orders were incorporated into the Settlement Agreement. At trial,
testimony was introduced, without objection, by each party regarding the terms of the
temporary orders and how they affected the Settlement Agreement. However, neither of the
temporary orders was introduced into evidence. For unknown reasons, which this Court
will neither question nor criticize, the parties declined this Court's invitation, after the trial,
to supplement the record by jointly stipulating copies of these orders into the record.
Accordingly, the Court will render this decision based upon the evidence introduced at trial.

3

* This Amended Memorandum Opinion is published solely to correct typographical errors
contained in the original Memorandum Opinion that do not change the substantive decision.

incorporated the Settlement Agreement, was entered by the State Court on April 13, 2009.

At the time of the Settlement Agreement, the couple's twenty-three year old son and eighteen year old daughter were living away from home while attending college. The couple's other two daughters, ages twelve and fifteen, were living at the marital residence in Oconee County, Georgia, where the family had resided for fifteen years. The marital residence is encumbered by two liens with total monthly payments of $6,100.

Debtor is fifty-five years old and is a periodontist. According to Section 10 of the Settlement Agreement, when the Settlement Agreement was executed, Debtor's gross monthly income was approximately $19,715.

Norma is fifty-six years old. She has a B.A. in sociology, a minor in psychology, and worked in private sales and at the Georgia Division of Family and Children Services prior to marriage. Debtor was just beginning his dental practice when the couple married and, until she became pregnant with their first child, Norma worked at Debtor's office as secretary and receptionist, doing "everything needed". Since the birth of their first child, Norma has been a homemaker and community volunteer. She testified at trial that she has a condition known as fibromyalgia, a condition associated with stress which brings on flu-like symptoms, joint pain, depression and lack of sleep, which she contends limits her employment opportunities.

The Settlement Agreement is twenty-six pages long, excluding exhibits relating to custody and visitation rights and the division of personal property. Under the Settlement Agreement, the couple retained joint legal custody of the minor children, but Norma retained physical custody, with Debtor having liberal visitation rights.

Under Section 3 of the Settlement Agreement, the marital residence was to be

4

immediately placed on the market and sold, with Norma and the children having residential

rights until its sale. Upon sale, Norma was entitled to select a new home for Debtor to

purchase for her at a purchase price of no more than $415,000.[2] Debtor could select the type

of financing for the purchase price, but was required to pay off the financing no later than

eight years (96 months) after purchase.[3] Debtor was entitled to claim the tax deduction for

any interest payments on the replacement home. Further, until it was paid for, Debtor was

required to maintain property insurance on the replacement home, with Norma being

responsible for property insurance thereafter.

Under Section 4 of the Settlement Agreement, Debtor was to pay Norma $200,000 in

exchange for her interests in certain parcels of real estate, partnerships and corporations.

The Settlement Agreement required Debtor to pay Norma $45,000 within forty-eight hours

after execution of the Settlement Agreement (which the parties acknowledge was paid) and

the balance of $155,000 upon the sale of the marital residence.

Except for three specific changes set forth in Section 5, Debtor was required to make

---

[2] If the price of the new home selected by Norma was less than $415,000, then Debtor
was required to pay Norma the difference in cash.

[3] The ninety-six months was reduced by the number of months Debtor made
payments to Norma under the temporary orders after the entry of the Divorce Decree.
As explained in Section 3 of the Settlement Agreement:

> . . . if [Debtor] pays [Norma] pursuant to the terms set out in the Temporary
> Order for three months after the entry of the [Divorce Decree] in this case,
> because it takes three months to sell the marital residence, to close on [Norma's]
> new home and for [Debtor] to pay [Norma] said $200,000 as set out in Section 4
> herein; [Debtor] shall pay off the debt on [Norma's] new home in full no later
> than ninety-three (93) months from the date the property is purchased for
> [Norma].

child support, alimony, debt division and all other financial payments as set forth in the

temporary orders until the sale of the marital residence, the purchase of the new home and

the payment of the $200,000 to Norma as required by Section 4. However, once those three

contingencies occurred (sale of the home, purchase of the replacement home and payment of

the $200,000), Debtor's financial obligations on numerous items including those relating to

child support and alimony, changed. For instance, upon the occurrence of these

contingencies, Debtor's monthly alimony payments to Norma increased from $1,500 per

month to $4,200 per month. Child support increased from $2,426.31 per month to $2,800

per month.

Debtor's obligations to pay monthly alimony was for a period of ninety-six months.

However, as with the time frame for payment of the financing on the replacement home, the

ninety-six month period of alimony was reduced by the number of months which Debtor

paid alimony in accordance with the temporary orders after the entry of the Divorce Decree.

Accordingly, the time frames for the payoff of the replacement home financing and for the

period over which monthly alimony was to be paid were identical.

The balance of the Settlement Agreement addresses issues regarding life, car and

medical insurance, additional child support, division of retirement and brokerage accounts,

payment of attorneys fees, tax returns, car payments and the children's college accounts. As

stated above, some of these obligations changed after the replacement home was purchased

and Norma was paid the $200,000.

In accordance with the Settlement Agreement, the marital residence was placed on

6

the market for sale at a price of $1,200,000.[4]  However, due, in part, to the nationwide
financial crisis which began in 2008, the parties have been unable to sell the house.

     In June, 2007, after the divorce was filed, Debtor purchased a new home for himself.
He has since remarried.  Debtor testified that, when he signed the Settlement Agreement, he
expected to be able to sell the marital residence within three to four months.  He was
expecting a significant tax refund which he believed would be enough to fund the mortgage
payments on the marital residence until it sold.

     Due to his inability to sell the marital residence and, as a result of other financial set-
backs, Debtor stopped making the mortgage payments in April, 2011 and filed this Chapter
13 case.

     Debtor has filed a Chapter 13 plan.  Under the plan, he proposes to surrender the
marital residence to the lien holders and to Norma. [5]  In addition, he characterizes as
"domestic support obligations" his obligation under the Settlement Agreement to pay off a
vehicle driven by Norma, to pay Norma $5,000 moving expenses and to pay child support
and alimony totaling $4,526 per month.  However, he proposes to treat all other financial
obligations under the Settlement Agreement as general unsecured claims, to receive a pro
rata distribution with the other unsecured claims, with any unpaid balance being discharged.
Norma filed her complaint contending that Debtor's obligation under Section 3 of the

---

[4] The Settlement Agreement gave Debtor the right to set the sales price.

[5] The record in the main Chapter 13 case shows that on October 31, 2011, the Court
granted SunTrust Mortgage, Inc., the holder of the first lien, relief from stay to foreclose on
the marital residence.  At trial, the parties testified that, to their knowledge, no foreclosure
proceedings had begun.

7

Settlement Agreement to provide her with a replacement home with a purchase price not to

exceed $415,000 is a domestic support obligation which is not dischargeable pursuant to 11

U.S.C. § 523(a)(5).


## CONCLUSIONS OF LAW

In general, once a debtor has completed all of his payments under a confirmed

Chapter 13 plan, the debtor is entitled to a discharge.  11 U.S.C. § 1328(a).  However,

pursuant to 11 U.S.C. §§ 1328(a)(2) and 523(a)(5), a debtor cannot receive a discharge from

"domestic support obligations".  11 U.S.C. § 101(14A) provides:

> The term 'domestic support obligation' means a debt that accrues
> before, on, or after the date of the order for relief in a case under this
> title, including interest that accrues on that debt as provided under
> applicable nonbankruptcy law notwithstanding any other provision of
> this title, that is -
> > (A) owed to or recoverable by -
> > > (i) a spouse, former spouse, or child of the debtor or
> > > such child's parent, legal guardian, or responsible
> > > relative . . .
> > (B) in the nature of alimony, maintenance, or support . . . of
> > such spouse, former spouse, or child of the debtor or such
> > child's parent, without regard to whether such debt is
> > expressly so designated;
> > (C) established or subject to establishment before, on, or after
> > the date of the order for relief in a case under this title, by
> > reason of applicable provisions of -
> > > (I) a separation agreement, divorce decree, or property
> > > settlement agreement;
> > > (ii) an order of a court of record; or
> > > (iii) a determination made in accordance with
> > > applicable nonbankruptcy law by a governmental unit;
> > > and
> > (D) not assigned to a nongovernmental entity, unless that
> > obligation is assigned voluntarily by the spouse, former
> > spouse, child of the debtor, or such child's parent, legal

> guardian, or responsible relative for the purpose of collecting
> the debt.

Obligations incurred by the Chapter 13 debtor in connection with a divorce which are not

domestic support obligations under 11 U.S.C. § 101(14A) are covered by 11 U.S.C. §

523(a)(15). Those types of obligations are generally referred to as being in the nature of

property division and are dischargeable.[6]

> The Eleventh Circuit has held:

> > Whether a given debt is in the nature of support is an issue of federal
> > law. Although federal law controls, state law does provide guidance
> > in determining whether the obligation should be considered 'support'
> > under § 523(a)(5). To make this determination a bankruptcy court
> > should undertake a simple inquiry as to whether the obligation can
> > legitimately be characterized as support, that is, whether it is in the
> > *nature* of support.

> > In conducting this inquiry, a court cannot rely solely on the label used
> > by the parties. As other courts have recognized, it is likely that
> > neither the parties nor the divorce court contemplated the effect of a
> > subsequent bankruptcy when the obligation arose. The court must
> > therefore look beyond the label to examine whether the debt actually
> > is in the nature of support or alimony. A debt is in the nature of
> > support or alimony if at the time of its creation the parties intended
> > the obligation to function as support or alimony. Thus, the party
> > seeking to hold the debt nondischargeble has the burden of proving by
> > a preponderance of the evidence that the parties intended the
> > obligation as support.

*Cummings v. Cummings*, 244 F.3d 1263, 1265 (11th Cir. 2001) (internal quotations and

citations omitted) (emphasis in the original).

> Courts have developed numerous factors which can be considered when determining

---

[6] Property division obligations are not dischargeable in a Chapter 13 case if the debtor
cannot complete his plan payments and receives a "hardship discharge". 11 U.S.C.
§ 1328(b),(c)(2).

whether a divorce obligation is in the nature of support or alimony.  For instance, in

*Cummings*, the bankruptcy court found that the debtor's obligation to pay the wife

$6,300,000 was in the nature of a property settlement because:

> (1) the obligation [was] not subject to death or remarriage;
> (2) it [was] payable in three lump sums rather than installments; (3) it
> [was] non-modifiable; (4) it [was] not enforceable through contempt
> proceedings; (5) the divorce court derived it by equally dividing the
> assets and liabilities of the couple; (6) the minor children were
> separately awarded support of $5,150 a month; and (7) the divorce
> court separately awarded rehabilitative alimony.

*Id.* at 1265-66.  The Eleventh Circuit nevertheless held:

> Although the factors considered by the bankruptcy court are relevant
> to our inquiry, the touchstone for discharge ability under § 523(a)(5)
> is the intent of the parties.  In determining whether a particular
> obligation is in the nature of support, all evidence, direct or
> circumstantial, which tends to illuminate the parties subjective intent
> is relevant.

*Id.* at 1266.

Similarly, in the recent case of *Benson v. Benson (In re Benson)*, 441 Fed. Appx. 650

(11th Cir. 2011), the court noted with approval the factors listed by the court in *McCollum v.*

*McCollum (In re McCollum)*, 415 B.R. 625 (Bankr. M. D. Ga. 2009).  In that case, the

bankruptcy court listed seven factors to be considered, including:

> (1) the language of the divorce agreement; (2) the relative financial
> positions of the parties at the time of the agreement; (3) the amount of
> property division; (4) whether the obligation terminates on the death
> or remarriage of the beneficiary; (5) the number and frequency of
> payments; (6) whether the agreement includes a waiver of support
> rights; (7) whether the obligation can be modified or enforced in state
> court; and (8) whether the obligation is treated as support for tax
> purposes.

*Id.* at 631.  These cases indicate that, although these factors should be considered, none are

controlling, and no one factor is more important than any other.

Debtor argues that the obligation to provide Norma with a replacement home was
intended to be part of the property division between the couple. Both he and his divorce
attorney, Tom Camp, testified that the real estate, partnerships and corporations owned by
the couple had approximately $1,200,000 of equity. They testified that, under Section 4 of
the Settlement Agreement, Debtor was to receive all of the real property, as well as 100% of
the interest in the partnerships and corporations. The marital residence was to be sold and
the equity used to pay the $155,000 balance owed on the $200,000 payment due Norma
under Section 4. Debtor would then provide Norma with a new home worth $415,000 (or a
house plus cash in that amount). The net result of these transactions was that each party
would end up with property and cash of approximately $600,000.

Debtor argues that the language of the Settlement Agreements supports this
contention. He points out that Section 3 provides, "*As an equitable division of property*,
[Debtor] shall finance and pay for the home selected by [Norma]. The purchase price of the
home shall not exceed $415,000." (emphasis supplied). Further, Section 4 provides, "*As
an equitable division of property*, [Debtor] shall pay to [Norma] the sum of $200,000 for her
interest in*" the partnerships, corporations and real property. (emphasis supplied).

Debtor contends that support for Norma and the minor children was provided
elsewhere in the Settlement Agreement in the nature of alimony, child support, property
upkeep, insurance and educational expenses totaling over $8,574.90 per month. He argues
that neither he nor Norma treated the mortgage payments on the marital residence as

11

alimony for tax purposes.[7]  He points out that, since the obligation to purchase the
replacement home is absolute and does not terminate on Norma's death or remarriage,
neither party could treat the obligation as alimony for tax purposes. [8]  He contrasts this with
his obligation to pay monthly alimony under Section 7 which does terminate upon Norma's
death or remarriage.

        Norma testified that she understood that the replacement home obligation was
intended for her support.  Her divorce attorney, Kim Michaels, also testified that the
replacement home obligation was intended as support.  Michaels testified that she was
concerned about the impact of a possible bankruptcy by Debtor and wanted to make sure
that the obligation was treated as support and thus not dischargeable.  Accordingly, she
testified that she negotiated a provision in Section 25 of the Settlement Agreement that
provides:

> The parties acknowledge that, but for [Debtor's] paying for [Norma's]
> new home, her automobile and said $200,000, [Norma] would not be
> able to be financially independent and would depend upon [Debtor]
> for support in order to provide herself with necessaries (sic), a home
> and an automobile to drive.  Therefore, it is the parties' intention that
> if [Debtor] ever seeks bankruptcy protection, the amounts payable
> under this Settlement Agreement as to a division of marital property
> shall not be dischargeable in bankruptcy under 11 U.S.C. § 523(a)(5),
> as the payments are in the nature of alimony for her support and
> maintenance.

---

[7] Pursuant to Section 21 of the Settlement Agreement, Debtor did claim deductions for
property taxes and mortgage interest paid on the marital residence.  However, Norma did not
treat these payments as alimony income on her tax return.

[8] *See* IRS Publication 17, Chapter 18, p 134-35 (2009); *See also* 26 U.S.C. § 71(b) and
26 C.F.R §1.71-1 et.seq.

Debtor and Camp testified that neither of them remember any negotiations on the bankruptcy language in Section 25. Camp testified that none of his file notes taken during the negotiations indicate that the bankruptcy language was ever discussed. Camp testified that, when the Settlement Agreement was being negotiated, he did not think that bankruptcy would ever be an option for Debtor due to his financial strength and the equities in his property.

A mechanical application of the factors to be considered when determining whether an obligation is in the nature of support does not provide a definitive answer in this case. Weighing in favor of characterizing the obligation as a property division are the factors that (1) the obligation is not terminable by death or remarriage of Norma, (2) the amount, $415,000, is part of an award which was derived at by equally dividing the equity in the marital property, (3) the minor children were separately awarded support in other parts of the Settlement Agreement, (4) rehabilitative alimony is provided in other provisions of the Settlement Agreement, and (5) since the obligation is not terminable by death or remarriage of Norma, the obligation cannot be treated as alimony for tax purposes.

On the other hand, weighing in favor of characterizing the obligation as in the nature of support are the factors that (1) the time-frames for payment for the replacement home financing and alimony are the same, (2) Norma waived the right to seek modification of alimony, and (3) the relative financial position of Debtor at the time of the Agreement was significantly greater than that of Norma.

As for the language of the Settlement Agreement, Norma points out that the replacement home obligation is found in Section 3 and does not mention that it is in return

13

for Debtor's interest in the other real property, partnerships and corporations. She argues that Section 4 specifically states that the obligation to pay $200,000 is the consideration she was to receive in return for her interests in that property. She also argues that Section 25 specifically states that the parties intended for the replacement home obligation to be treated as in the nature of support. However, as Debtor argues, Section 3 does state that the replacement home obligation is part of the "equitable division of property". Nevertheless, the label used by the parties in the Settlement Agreement does not necessarily bind this Court. *Cummings,* 244 F.3d at 1265. Accordingly, the language of the agreement provides no definitive answer to how the obligation should be characterized.

This case is similar to *Benson, supra.* There the issue was whether the debtor's obligation to pay off the home mortgage which the ex-wife retained was a property settlement or support obligation. The court found that the structure of the agreement between the parties supported the contention that the obligation was for support because, inter alia, (1) in consideration for the benefits under the agreement, the ex-wife had waived alimony, (2) the debtor was required to maintain life insurance sufficient to cover the obligation and (3) at the time of the agreement, the ex-wife had not worked outside the home for at least a decade.

In the case at bar, this Court finds that the overall structure of the Settlement Agreement supports the conclusion that the obligation to provide a replacement home was intended to be in the nature of support. The time frames for the payment of the replacement home financing and the payment of alimony are identical. As long as these obligations continue, Debtor is required to maintain $500,000 in life insurance and pay for property

14

insurance on the replacement home. In return for the benefits under the Settlement

Agreement, Norma waived all other alimony and also "her statutory right to future

modifications, up or down, of alimony payments provided for herein based upon a change in

the income or financial status of either party." Settlement Agreement Section 26. At the

time the Settlement Agreement was signed, Norma had not been employed for over two

decades. And, as previously noted, Section 25 specifically states that the obligation to

provide the replacement home is in the nature of "alimony for her support and

maintenance".

The Court also notes that Section 26 of the Settlement Agreement provides:

> Wife recognizes and acknowledges that the forgoing provisions for
> her benefit are satisfactory and that they are reasonable and adequate
> for her support and maintenance, past, present, and future, and in
> keeping with her *accustomed mode of living, reasonable requirements
> and station in life*.

(emphasis supplied) . At trial, Norma testified that, prior to the divorce, Debtor provided

her with an allowance of $14,000 per month for the payment of the mortgage and all other

family bills. Under the Settlement Agreement, Debtor's obligations to Norma prior to the

sale of the marital residence and purchase of a new house total $8,574.90. Debtor is also

required to continue to make the $6,100 monthly mortgage payments on the marital

residence. Accordingly, his total obligations prior to the sale of the marital residence is

$14,675, an amount similar to Norma's "accustomed mode of living" during the marriage.

Similarly, after the sale of the marital residence, and until the replacement home is

paid for, his monthly obligations to Norma, excluding the replacement home mortgage, total

15

$9,669. A simple eight year amortization of a $415,000 mortgage at three percent[9] yields a monthly payment of $4,867. When added to the other obligations, this totals $14,536 per month, again an amount similar to Norma's "accustomed mode of living" prior to the divorce.

These factors strongly suggest that it was the intent of the parties under the Settlement Agreement to ensure that Norma's "accustomed mode of living, reasonable requirements and station in life" would not be changed as a result of the divorce. Debtor inadvertently acknowledged this during his testimony when, in response to his lawyer's question of whether he thought Norma would have enough money to support herself, he responded, "$9,000 a month with hardly any bills? I think you could." Of course, Norma would have "hardly any bills" only if he was also providing her with a replacement home as part of her support.

In conclusion, this Court finds that the parties intended Debtor's obligation to provide Norma with a replacement home to function as support. Accordingly, this obligation is a "domestic support obligation" as defined by 11 U.S.C. § 101(14A) and is thus nondischargable under 11 U.S.C. § 523(a)(5).

An order in accordance with this memorandum opinion shall be entered this date.

** END OF DOCUMENT**

---

[9] Pursuant to Rule 201 of the Federal Rules of Evidence, the Court takes judicial notice that current mortgage rates are between 3 and 4 percent.

16